JAMES BROOKS *vs.* ARCHITECTURAL BARRIERS BOARD
& another.[1]

Suffolk. September 17, 1982. — November 2, 1982.

Present: BROWN, CUTTER, & DREBEN, JJ.

*Administrative Law*, Agency, Agency's interpretation of statute, Regulations. *Regulation. Architectural Barriers Board.*

The Architectural Barriers Board acted within its discretionary authority in refraining from exercising fully its potential jurisdiction respecting access by handicapped persons to a theatre located in the basement of a multistory public building, where the board had determined, by promulgating a regulation generally applicable and consistent with its enabling legislation, that its jurisdiction to require the provision of means of access for handicapped persons as an incident to proposed alterations of a public building would not be exercised as to alterations costing less than five percent of the building value, and where the regulation, in the circumstances, represented reasonable compliance with a broadly expressed statutory policy. [588-590]

In determining whether the operators of a theatre located in a large, multi-use public building had expended more than five percent of the theatre's value on certain alterations and were thus subject to a regulation respecting access by handicapped persons, the Architectural Barriers Board was not required to accept a method of valuation which would apportion to the theatre the total value of the building on a square foot basis. [590]

CIVIL ACTION commenced in the Superior Court Department on August 25, 1980.

The case was heard by *Young*, J.

*William J. Rooney, Jr.* (*Kenneth W. Shulman* with him) for the plaintiff.

---

[1] Brooks by amendment of the complaint for judicial review has become the only person continuing to seek relief. The Architectural Barriers Board and Saxon Theatre Corp. (Saxon) remain as defendants. Saxon admits that it does business under the name of Sack Theatres and operates the theatre at One Beacon Street through an affiliated corporation.

*Thomas A. Barnico*, Assistant Attorney General, for Architectural Barriers Board.

*James S. Dittmar* for Saxon Theatre Corporation.

CUTTER, J. Brooks is a disabled person confined to a wheelchair. With others no longer parties, he sought in the Superior Court judicial review of a decision by which the Architectural Barriers Board (ABB) refrained from exercising its jurisdiction with respect to a Boston motion picture theatre (the theatre). The theatre, known as Sack Beacon Hill 1-2-3, is in the basement of a multistory structure (the structure) known as One Beacon Street.

ABB exists by virtue of G. L. c. 22, § 13A, as appearing in St. 1974, c. 528, § 1. (Subsequent amendments in St. 1979, c. 661, and St. 1981, c. 346, § 1, have no bearing.) Section 13A provides that ABB "shall make and from time to time . . . amend . . . in accordance with the provisions of chapter thirty A,[2] rules and regulations designed to make public buildings accessible to . . . physically handicapped persons," a term which (under § 13A) includes persons "confined to a wheel chair." The term "public building" includes "privately financed buildings . . . open to and used by the public." Section 13A also provides that "[t]here shall be no . . . alteration or remodeling of a public building except in conformity with said rules and regulations . . . ."[3]

---

[2] General Laws c. 30A, § 1(5), as amended, defines as a "regulation" every "rule, regulation, standard or other requirement of general application . . . adopted by an agency to implement or *interpret* the law enforced or administered by it" (emphasis supplied), with certain exceptions not here pertinent. See Rep. A.G., Pub. Doc. No. 12, at 159, 160 (1975).

[3] "Alteration" is defined by § 13A as "external or internal rehabilitation or renovation [a] for which a building permit is needed or [b] *for which the cost* of such rehabilitation or renovation equals or *exceeds five per cent of the full and fair cash value of the building* or, [*sic*] [c] any work determined to be alteration by a *state or local* building inspector" (emphasis and bracketed letters supplied). "Remodeling" is defined as "modification beyond an interior decoration or involving any structural change, or the refurbishing, updating or redecorating of a public building for which the cost of such refurbishing, updating or redecorating equals or exceeds five per cent of the full and fair cash value of the building."

ABB, upon Brooks's request that it take action to require the theatre to comply with its regulations to make the theatre accessible to handicapped persons, found the following facts among others. The "[t]heatre occupies a distinct space and constitutes a distinct use within the . . . structure, with its own entrances and facilities." Pursuant "to a building permit issued after March 3, 1977," Sack in 1979 made extensive theatre alterations worth between $150,000 and $160,000. The total market value of the structure was then $77,000,000. The evidence did not permit ABB to find, at least to its satisfaction, (a) the value of the theatre with reference to its assessed value for tax purposes (because it was the subject of a special agreement with the city under G. L. c. 121A), or (b) what portion of the total value of the structure constitutes the value of the theatre.

The ABB decided that, although the structure "contains many uses not subject to regulation" by ABB under 521 Code Mass. Regs. (C.M.R.) § 3.7.5, the regulations (at least if otherwise satisfied) could be applied to the portion of the structure used for theatre purposes. It ruled, however, that its regulations "do not provide any reasonable means of allocating what portion of" the structure's value of $77,000,000 "constitutes the value of the [t]heatre."

In 1979, ABB's regulations[4] under 521 C.M.R. § 4.7.2 provided: "The following formula shall apply and govern reconstruction, alteration, remodeling or change of use: A. If the work being performed amounts to less than five

---

[4] The regulations effective in 1979 adopted substantially verbatim the statutory definitions (see note 3, *supra*) of "alteration" and "remodeling." See 521 C.M.R., §§ 4.3 and 4.13. With respect to building values, the regulations stated: "4.7 FULL AND FAIR CASH VALUE OF THE BUILDING: The assessed valuation of the building as recorded in the Assessors' office of the municipality as equalized at one hundred percent . . . valuation; or, if no assessed value, the fair market value . . . .

"4.7.1 The one hundred percent . . . equalized assessed value shall be based upon Massachusetts Department of Corporations and Taxation most recent determination of the particular city's or town's assessment ration" (*sic*).

percent . . . of the one hundred percent . . . equalized as-
sessed value of the building, *these [r]egulations do not ap-
ply*" (emphasis supplied). The ABB applied § 4.7.2 in pass-
ing upon Brooks's request. It noted that the definition of
"alterations" (both in § 13A and in its own regulations) in-
cludes (see note 3, *supra*, language following [a] and [b])
"both work which costs more than five percent of the value
of the buildings and any work for which a building permit is
needed." It rejected, however, the contention that (despite
§ 4.7.2 of the regulations) the theatre was required to com-
ply with its substantive regulations because a building per-
mit had been issued for the alterations. The ABB pointed
out that § 4.7.2 "may not reach the outer limits of [ABB's]
regulatory power . . . under . . . § 13A, but it is the regula-
tion in effect at the time" the alterations were made and it
"represents a fair threshold for the imposition of regulatory
burdens on building owners."

The ABB stated that it did "not have jurisdiction in this
case," a statement which we interpret as referring to ABB's
determination (by promulgating § 4.7.2, a generally ap-
plicable regulation) that it would not exercise the full extent
of its possible jurisdiction where proposed alterations did
not exceed five percent of the building value. The ABB
recognized that, as applied to multiuse buildings, its regula-
tions contained some "ambiguity"[5] and should be revised to
provide appropriate methods of measuring the value of
parts of large buildings devoted to separate uses.

In reviewing the ABB's decision the trial judge, relying on
*American Hoechest Corp.* v. *Department of Pub. Utils.*,
379 Mass. 408, 410-411 (1980), concluded that Brooks had
standing to seek judicial review. We assume (without de-
ciding) that this conclusion was correct because we agree

---

[5] Compare *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 342-345 (1964),
where (at 344) it was noted that "the details of legislative policy, not spelt
out in the statute, may appropriately be determined, at least in the first
instance, by an agency charged with administration of the statute," and
(at 345) that any ambiguity "appropriately should be clarified by regula-
tion rather than by less formal means."

with the trial judge that § 4.7.2, in any event, reflected a valid determination by the ABB to refrain (as stated in that section), with respect to alterations, from exercising its full potential jurisdiction.

1. The legislative delegation to the ABB to make and amend regulations is a broad one, and permits discretionary variations from the regulations where "compliance . . . is impracticable." See § 13A, fourth unnumbered par. The delegation exhibits a legislative intention to rely upon rules to be promulgated by a seven-member administrative board (at least three of whom must be physically handicapped) rather than on detailed statutory requirements. As the trial judge suggested, § 13A contains no "detailed commands to the ABB as to how it shall carry out" its functions. See *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524-526 (1979), and cases cited. In that case (at 525) it was stated that an "administrative agency generally has a wide range of discretion in establishing" the scope "of its authority pursuant to the enabling legislation." [6] We think (as did ABB) that this discretion extends to determining, at least by regulation generally applicable and consistent with the enabling legislation, what (in terms of percentage of total building value reflected in "alterations" cost) "represents a fair threshold for [the] imposition of [obviously expensive] regulatory burdens" upon members of the public. Likewise, as broad a grant of power to frame, amend, and deviate from regulations necessarily implies a range of authority for establishing priorities for enforcement of the general legislative policy. The broad grant also implies discretion concerning how to carry out a new legislative program with reasonable flexibility and in an orderly manner, giving suitable weight to the personnel and resour-

---

[6] The courts will "test . . . regulations by the same standard[s] which . . . apply to a statute" and will indulge "all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977).

ces available to the agency. See *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 854 (1977); *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 763 (1980). See also *United States* v. *Morton Salt Co.,* 338 U.S. 632, 647-648 (1950); and see generally as to administrative functions involving the exercise of discretion. *Nason* v. *Commissioner of Mental Health,* 351 Mass. 94, 97 (1966). We cannot say that ABB acted beyond its discretionary authority in adopting § 4.7.2, thus limiting application of its regulations to only one of the three alternative statutory definitions of "alteration" (but to the one which is the principal statutory definition in § 13A of the closely comparable word "remodeling"). See note 3, *supra.*

The authorities already cited appear to be the most nearly relevant Massachusetts decisions. We recognize that many of them relate largely to whether an agency has gone beyond its statutory authority in areas at the outer limits of the agency's potential jurisdiction. They do not deal squarely with the issue whether for good reasons an agency by regulation[7] may decline to exercise its full potential jurisdiction.[8] Giving consideration to the very great

[7] Such regulations perhaps more appropriately should be tested, when adopted, under G. L. c. 30A, § 7, rather than later under G. L. c. 30A, § 14.

[8] The Federal decisions are not uniform and vary among agencies and in the light of the different statutory policies requiring administrative enforcement. Cases tending to recognize agency discretion with respect to the exercise of jurisdiction include *Connecticut Light & Power Co.* v. *FPC,* 324 U.S. 515, 536 (1945); *Pan Am. World Airways, Inc.* v. *Civil Aeronautics Bd.,* 392 F.2d 483, 488-495 (D.C. Cir. 1968). Compare *Office Employes Intl. Union, Local 11* v. *NLRB,* 353 U.S. 313, 318-320, 321 (1957); *Rockbridge* v. *Lincoln,* 449 F.2d 567, 571-572 (9th Cir. 1971, where discretion to regulate was held not to be unlimited); *Alabama Power Co.* v. *Costle,* 636 F.2d 323, 357-360 (D.C. Cir. 1980, where de minimis exceptions were treated as acceptable, but more substantial deviations from the statutory policy were rejected); *Environmental Defense Fund, Inc.* v. *EPA,* 636 F.2d 1267, 1279-1284 (D.C. Cir. 1980). Compare also *United States ex rel. Louisville Cement Co.* v. *ICC,* 246 U.S. 638, 642-644 (1918); *Schwabacher* v. *United States,* 334 U.S. 182, 197-202 (1948).

breadth of the statutory delegation here involved, we conclude that ABB applied § 4.7.2 appropriately and that the regulation, so far as this record shows, was a reasonable compliance with the statutory policy, at least in the first few years of the agency's activity. It will be time enough to consider any revisions of ABB's regulations when they have been prepared.

2. The ABB was not bound to accept a method of apportioning to the theatre the total value of the structure on a square foot basis as proposed by Brooks. In 1979 neither § 13A nor the regulations provided a basis for apportioning (to a particular area being used for a special purpose) the value of a large multi-use building. The structure, as a whole, comprises (as can readily be observed) not only the theatre, but also a restaurant, a large bank, and a large number of floors of offices. The ABB reasonably could conclude that the total value of One Beacon Street[9] could not be apportioned fairly to areas devoted to such diverse uses on any arbitrary square foot basis. See generally the discussion in *Grocery Manufacturers of America, Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 74-77 (1979).

3. The ABB made findings of fact which show that, under § 4.7.2(A) of its regulations, its other regulations did "not apply" to the theatre alterations. ABB was satisfied that the circumstances stated in § 4.7.2(A) existed and that its general regulations did not apply to the theatre alterations. If facts existed which negated that conclusion, Brooks should have established those facts. See the somewhat analogous situation considered in *Droukas* v. *Divers Training Academy, Inc.,* 375 Mass. 149, 151 (1978).

*Judgment affirmed.*

---

[9] We need not and do not consider whether § 13A and the regulations in fact contemplated that the dollar value of the "alterations" should be considered in relation to anything less than the value of the whole building.