# J.M. HOLLISTER, LLC *vs.* ARCHITECTURAL ACCESS BOARD.

No. 11-P-1847.

Suffolk. May 3, 2012. - April 19, 2013.

Present: BERRY, MILKEY, & SULLIVAN, JJ.

Further appellate review granted, 465 Mass. 1105 (2013).

*Architectural Access Board. Handicapped Persons. Administrative Law,* Judicial review, Substantial evidence, Agency's interpretation of regulation. *Statute,* Construction. *Zoning,* Variance. *Words,* "Entrance."

Discussion of the standard of review applicable to a decision of the Architectural Access Board. [516-517]

The decision of the Architectural Access Board (board), acting pursuant to its regulations, that a certain storefront's three doors were separate entrances, and that the entrances were functionally different, was not arbitrary, capricious, or contrary to law, and the board's conclusion that one entrance was not handicapped accessible was not in excess of the board's statutory authority or in contravention of the nature and purpose of the statute underlying the regulations. [517-523] BERRY, J., dissenting.

The record in proceedings before the Architectural Access Board (board) supported the board's decision not to grant a variance to a storeowner with regard to a storefront entrance that the board concluded was not handicapped accessible, where compliance with the requirement of accessibility would have been of substantial benefit to physically handicapped persons, and where there was inadequate support for the storeowner's estimates of costs to comply. [523-524]

CIVIL ACTION commenced in the Superior Court Department on June 25, 2010.

The case was heard by *John C. Cratsley,* J., on a motion for judgment on the pleadings.

*Daniel P. Dain* for the plaintiff.

*Douglas S. Martland,* Assistant Attorney General, for the defendant.

SULLIVAN, J. The Architectural Access Board (board) issued a final order on May 26, 2010, requiring that the retailer J.M. Hollister, LLC (Hollister), make all entrances to its Kingston,

Massachusetts, store accessible to persons with disabilities.[1] Hollister sought review in the Superior Court pursuant to G. L. c. 30A, and a judge granted the board's motion for judgment on the pleadings. We affirm.

*Facts and procedural history.* Hollister is a clothing retailer that leases and operates a store in the Independence Mall in Kingston. Hollister began operating that store in late 2005. When it took over the space within the mall, Hollister replaced the existing, fully accessible mall-level interior entrance with two adjacent doorways. The central doorway is a "California surf shack" entryway that consists of two steps leading to a roofed porch extending to the sides of the door and outward from the wall of the store into the mall. The porch contains large plants, pictures, and other decorative items. In other stores, the porches contain chairs and magazines for customers. At the back of the porch, on the left and right side, are two steps leading back down to ground level and into the store proper, one leading to the men's clothing section (the "Dudes"), and one to the women's clothing section (the "Bettys").

The second doorway is a ground level, unadorned doorway with a mechanically operated door, located to the left of the porch. To the right of the porch (at that time) were a series of windows extending to the floor with plantation shutters, and a fire door, built to look like the windows. The door on the left also is designed to look like the plantation shuttered windows to the right, and the over-all theme is that of a California-style porch flanked by windows. A person entering the store through this left hand accessible door finds him or herself in the same location as if having entered through the porch and descended the stairs to the left.

Because the stairs lead up to the porch and then down again into the store, the porch doorway is not accessible. Eleven of the Hollister stores in Massachusetts use the stepped porch design, while others have the theme of a California surf shack entrance with no stairs. At the time of the initial complaint, dis-

---

[1]We use the term "accessible" to mean accessible to any person with a disability. See 521 Code Mass. Regs. § 5.1 (2006). This includes persons in wheelchairs, or others with a disability that interferes with the major life function of walking. See G. L. c. 22, § 13A.

abled persons wishing to patronize the Kingston store had to use the mechanically operated door on the left.

In January of 2008, Jennifer Niles, a wheelchair user, submitted a formal complaint to the board that the Kingston store was not accessible. The accessible doorway to the left of the central porch doorway did not function on multiple occasions. As a result of the complaint, the board began an investigation, during which Hollister applied for a variance from its obligation to make all public entrances to the store handicapped accessible. See 521 Code Mass. Regs. § 4.1 (2006). The board denied this application on the grounds that Hollister had failed to prove that it was impractical to make the porch entrance accessible.

Hollister appealed and requested an adjudicatory hearing before the board. See 801 Code Mass. Regs. § 1.02 (1998). Hollister argued that the multiple doorways at the front of the store were in fact one single entrance; and that since one of the doorways at this single entrance was accessible, the entrance satisfied the board's regulations requiring that all public entrances be accessible.

After a hearing in November, 2008, the board found that Hollister was not in compliance with 521 Code Mass. Regs. § 2.6 (2006) because the left hand door was still not reliably functional[2] and the central porch doorway was not accessible. The board ruled that Hollister had impermissibly created the noncomplying condition and failed to show either that compliance was impractical or that the cost of compliance was disproportionate to the benefits it would create for the disabled. The board ordered Hollister to bring the store into compliance. See G. L. c. 22, § 13A; 521 Code Mass. Regs. §§ 1.00, 4.00, 26.00 (2006).

Hollister then sought judicial review of the board's decision. A judge of the Superior Court remanded the matter to the board to determine whether the left hand door had in fact been made fully functional, for further consideration of the board's ruling that the (at that time two) doorways were separate entrances, and whether Hollister should be granted a variance. After the

---

[2]The door was on a separate circuit and did not open when the store was opened. The staff had to turn the circuit on and failed to do so on multiple occasions. Hollister indicated it would explore whether all the doors could be put on the same circuit.

original complaint was filed, and the first hearing was held, Hollister altered the fire exit door to the right of the porch so that it became a second accessible door. It is identical in appearance to the door on the left, and leads to the same location as the porch stairs inside the store that lead downward to the right hand side of the store interior. Both the left hand and right hand doors are physically separated from the central porch door.

The board held two evidentiary hearings to address these questions. The board found that the left hand accessible door was not yet fully functional, but that a newly modified right hand door (previously a fire door) was accessible. The board then considered whether the three separate doors at the front of the store constituted a single entrance or multiple entrances.

The board concluded that each door was a separate "entrance" as defined in the regulations, and Hollister was therefore required to make each entrance, including the porch entrance, accessible to the disabled. The board considered whether modifying the porch (by removing or altering the steps) was impractical either because it was technologically infeasible or because the costs of modification outweighed any resulting benefit to the disabled users. See G. L. c. 22, § 13A. The board found that modification was feasible, given that Hollister had constructed other stores with the porch-like facade but without steps, and that the porch aesthetic would not be compromised by the removal of the steps. The board also found that the cost of modification was far outweighed by the potential benefits to disabled users, and that Hollister's cost estimates were not credible.

Hollister appealed this decision of the board, and moved for judgment on the pleadings. A judge of the Superior Court upheld the board's finding that the entrances were separate, and found that there was substantial evidence to support the denial of a variance. This appeal followed.

*Discussion.* 1. *Standard of review.* Hollister argues that the board's decision is arbitrary and capricious and contrary to law, because the three doors constitute a single entrance to the store. See G. L. c. 30A, § 14(7)(c) & (g). We consider these arguments in the context of the standard of judicial review of administrative decisions. We review questions of law de novo, see *Rosing* v. *Teachers' Retirement Sys.*, 458 Mass. 283, 290 (2010),

keeping in mind that the board has been vested by statute with a "wide range of discretion in establishing the scope of its authority." *Brooks* v. *Architectural Barriers Bd.*, 14 Mass. App. Ct. 584, 588 (1982) (citation omitted). See G. L. c. 22, § 13A. Like all administrative agencies, the board's interpretation of the statute and regulations is entitled to considerable deference, especially where, as here, the legislative grant of authority is very broad. See *Pyramid Co. of Hadley* v. *Architectural Barriers Bd.*, 403 Mass. 126, 131 (1988); *Brooks, supra.*

2. *Entrance.* a. *Statute and regulations.* The statute provides that the board is fully empowered to adopt regulations "designed to make public buildings accessible to, functional for, and safe for use by physically handicapped persons." G. L. c. 22, § 13A, as amended by St. 1986, c. 642, § 2. The intent of the regulations, consistent with the remedial purpose of the enabling legislation, see *Iodice* v. *Architectural Access Bd.*, 424 Mass. 370, 375 (1997), is to "provide persons with disabilities full, free, and safe use of all buildings and facilities." 521 Code Mass. Regs. § 2.2 (2006). All new construction of or in public buildings must comply in full with the requirements of the statute and the board's regulations. See G. L. c. 22, § 13A; 521 Code Mass. Regs. § 3.2 (2006).

The term "accessible" is defined in § 13A, as amended by St. 1986, c. 642, § 2, to mean "the state of a . . . building . . . that complies with this section and any rules or regulations promulgated hereunder and that can be approached, entered and used by physically handicapped persons." The regulations require that "[a]ll public entrance(s) of a building or tenancy in a building shall be accessible." 521 Code Mass. Regs. § 25.1 (2006). The term "all" was added to the regulations in 1996. Prior to this change, the regulations required access only at the "primary public entrances." See *Iodice* v. *Architectural Access Bd., supra*; 521 Code Mass. Regs. § 26.1 (1987).

The board found that the three doors were separate entrances because each door constituted a separate access point to the store. The board's regulations define entrance as "[a]ny access point to a building or portion of a building or facility used for the purpose of entering. An entrance includes the approach walk, stairs, lifts, ramp or other vertical access leading to the

entrance platform; the entrance platform itself; vestibules, if provided; [and] the entry door(s) or gates . . . ." 521 Code Mass. Regs. § 5.1 (2006). The board also found that the entrances were functionally different. The porch entrance provided an ostensibly central point of access, giving customers a choice as to which side of the store to patronize, while the side doors do not.

Judged by the definition of entrance in the regulations, the decision is not arbitrary, capricious, or contrary to law.[3] The central doorway was on a raised platform, separate and distinct from the other doorways. The board acted well within its powers when it ruled that the term "any access point" could be construed to mean access points differentiated in this manner. The raised platform entrance was separately constructed. Hollister converted a previously accessible entrance to an inaccessible one. Other Hollister stores did not have the porch entrance. Furthermore, the board had amended its regulations in 1996 to require that all entrances be accessible in order to protect "full, free, and safe" access. The regulations have the force and effect of law. See *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427 (1983).

Hollister maintains that the board's own regulations contemplate that steps may be part of the design of a single entryway, and that there is therefore only one entrance. The fact that the regulations refer to stairs does not mean that the board was required, as a matter of law, to consider a door which is accessible by stairs alone to be the same entrance as doors that are physically separate and accessible, but at a different grade.[4] Nor

---

[3] The dissent expresses concern that the board's interpretation will have far-reaching effects on both architectural design and construction costs. The 1996 amendment to the regulations requiring full accessibility at *all* public entrances (rather than simply primary ones) reflects the legislative preference favoring access. "[T]he [board's] regulations are 'use' rather than 'design' regulations, for the policy behind them demands that buildings be accessible, functional, and safe as used. Otherwise, the [L]egislature's objective would not be met." *Iodice* v. *Architectural Access Bd.*, *supra*.

[4] The administrative record contains several photographs of office buildings with exterior central revolving doors that were inaccessible, directly flanked by side doors that were accessible. The doors were at the same grade, the approach was accessible by some combination of stairs and ramps, and in every case the revolving doors were exterior doors, not interior entrances. There was one photograph where the revolving door had no adjacent accessible door, an example that the board questioned as noncompliant.

is the board required, contrary to its own regulations, to approve new construction that creates architectural barriers where none previously existed.[5] Hollister would have the board draw a different conclusion regarding the impact of the placement of the stairs in relation to the central porch door and the side doors, but this court "may not displace an administrative [agency's] choice between two fairly conflicting views." *Embers of Salisbury, Inc.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 526, 529 (1988). See *Dotson* v. *Commissioner of Rev.*, 82 Mass. App. Ct. 378, 385 (2012).

Hollister also maintains that the board's regulations permitting handicapped accessible doors adjacent to a central revolving door compels approval of the central porch design.[6] See 521 Code Mass. Regs. §§ 25.1, 26.2, 26.3 (2006). The board was not required to treat the porch door in the same manner as revolving doors. The applicable regulations provide that inaccessible revolving doors and turnstiles are permitted so long as there is an "adjacent door" that is accessible and permits the "same use pattern." See 521 Code Mass. Regs. §§ 26.2, 26.3. The board's regulations thus make a limited exception to the requirement of full accessibility at every point of access *only* for revolving doors and turnstiles. The regulations did not extend this exception to the porch design, and the board declined to

---

[5]There was no evidence in the administrative record that the board had approved new construction that had converted what had been a fully accessible entrance into one that was not, or that it had permitted the addition of stairs to render a previously accessible entrance inaccessible.

[6]Hollister suggests that past practice supports their view, noting that eleven building inspectors in various cities and towns have approved this design. However, as Hollister acknowledges, the issuance of the permit is not binding on the board. The statutory structure makes the board the final arbiter of the statute. See *Iodice* v. *Architectural Access Bd.*, 424 Mass. at 374. One reason for the existence of the board was the lack of knowledge and enforcement of accessibility criteria at the local level. See Senate Committee Rep. No. 2096, "Final Report of the Committee on Human Services and Elderly Affairs Relative to the Problems of Handicapped Persons in Relation to Architectural Access and Barriers in the Commonwealth" (Sept. 8, 1986), at 6. "Moreover, especially where, as here, a legislatively declared important public interest is involved, estoppel is not applied to the enforcement of a statute." *Home-Like Apartments, Inc.* v. *Architectural Access Bd.*, 27 Mass. App. Ct. 851, 857 (1989), quoting from *Cellarmaster Wines, Inc.* v. *Alcoholic Bevs. Control Commn.*, 27 Mass. App. Ct. 25, 29 (1989).

endorse any further exception. That determination is one that falls within the board's broad discretion and special expertise, and we will not disturb it. See *Pyramid Co. of Hadley* v. *Architectural Barriers Bd.*, 403 Mass. at 131; *Provencal* v. *Commonwealth Health Ins. Connector Authy.*, 456 Mass. 506, 514 (2010).[7]

b. *Statutory purpose and legislative history.* Hollister's fundamental argument is that the agency is not entitled to deference because it has acted in excess of its statutory authority by embarking upon a hypertechnical interpretation of the regulations that is contrary to the statutory mandate. The statutory purpose, Hollister submits, is sufficiently fulfilled by having two accessible and one inaccessible door in close proximity because patrons can get into the store, and once inside, can go from the "Dudes" side to the "Bettys" side within the store.

This argument fails in two respects. First, as discussed above, it misperceives the breadth of authority granted to the agency. See *Brooks* v. *Architectural Barriers Bd.*, 14 Mass. App. Ct. at 588. This statute is one in which the Legislature has given expansive powers to an administrative agency to promulgate and enforce regulations. See *Iodice* v. *Architectural Access Bd.*, 424 Mass. at 375. The statutory definition of accessibility incorporates those regulations. See G. L. c. 22, § 13A. "When the Legislature delegates to an administrative agency a broad grant of authority to implement a program of reform or social welfare, the administrative agency generally has a wide range of discretion in establishing the parameter of its authority pursuant to the enabling legislation." *Lindsay* v. *Department of Social Servs.*, 439 Mass. 789, 797 (2003), quoting from *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 525 (1979).

Second, this argument misperceives the nature and purpose of

---

[7]Even if this exception were applied, the side doors do not permit the same use pattern — that is, entry through a single door and the choice to turn left or right. The examples provided by Hollister of buildings with a central inaccessible revolving door had side doors that were directly adjacent to the central door and permitted the same use patterns. Here the side doors were adjacent to the porch, not the central entrance, and therefore, as a functional matter, could not and did not meet either the requirement that the doors be adjacent or the requirement that the use patterns be the same. One example provided by Hollister showed a side door at some distance from the central entrance, a configuration that the board, at hearing, indicated was noncompliant.

the statute. We therefore turn to the legislative history of the statute. See *Tyler* v. *Michaels Stores, Inc.* 464 Mass. 492, 496-499 (2013). The origins of the Massachusetts statute date to 1957, when then President Eisenhower formed the Committee on the Employment of the Handicapped (committee). The committee was charged with addressing the accessibility issues faced by, among others, the approximately 2,000 service members who had returned from World War II as paraplegics.[8] The President's committee worked with other organizations to develop standards of accessibility for public buildings.[9] These standards were published in 1961 by the American National Standards Institute (ANSI). All states were urged to adopt the ANSI standards. See Goldman, Architectural Barriers: A Perspective on Progress, 5 W. New Eng. L. Rev. 465, 467-468 (1983).

Massachusetts did so in 1962, requiring that all new buildings built by the Commonwealth or its political subdivisions comply with the ANSI standards. See St. 1962, c. 662. In 1967, the General Court enacted G. L. c. 22, § 13A, see St. 1967, c. 724, § 1, which created what is now known as the Architectural Access Board, and extended the reach of the statute to new construction in, and remodeling and repair of, existing public buildings. The scope of the statute was, over time, steadily expanded to include all manner of public spaces, including shopping malls.[10]

---

[8] See Design for All Americans: A Report of the National Commission on Architectural Barriers and the Rehabilitation of the Handicapped, H.R. Doc. No. 324, 90th Cong., 2d Sess. 5 (1968).

[9] The impetus for the national effort was brought into sharp relief when the committee sought to give the Handicapped American of the Year award to Hugh Deffner, an accessibility advocate from Oklahoma City, at a ceremony in the Capitol Building. The Capitol Building was inaccessible, however, and Mr. Deffner had to be carried up the steps of the Capitol Building by two Marines to receive his award. See Goldman, Architectural Barriers: A Perspective on Progress, 5 W. New Eng. L. Rev. 465, 467-468 (1983). In addressing Deffner, President Eisenhower remarked, "I think my feeling in this matter is deepened by the fact that I had a prominent position in World War II and in carrying out the mission that was assigned to me by the American government, necessarily, many people lost their lives; others were permanently injured . . . ." Remarks to the President's Committee on the Employment of the Physically Handicapped (May 23, 1957). Found at http://quod.lib.umich.edu/p/ppotpus/4728417.1957.001/451?view=image&size=100 (last viewed Apr. 18, 2013).

[10] The statute was first amended in 1971 to include public housing and other

In 1986, the Senate conducted a complete review of the agency and its enforcement actions and considered further amendment to the statute. See Senate Committee Rep. No. 2096, Final Report of the Committee on Human Services and Elderly Affairs Relative to the Problems of Handicapped Persons in Relation to Architectural Access and Barriers in the Commonwealth (Sept. 8, 1986) (Senate Committee Report). Highly critical of the performance of the board, the Senate Committee Report urged more systematic and aggressive enforcement, and set forth a number of recommendations, virtually all of which were then adopted either by passage of new legislation,[11] amendment of regulations,[12] or administrative action. In that report, the Senate Committee set forth in unambiguous terms its view of the purpose of the statute and the then pending 1986 amendments. The "goal of the law was to ensure that all new construction and major renovations be designed and built in such a way as to provide 100 [percent] accessibility to disabled persons." *Id.* at 6. The Senate Committee Report characterized the statute as part of a "new public policy rooted in . . . guarantees of equal protection and equal opportunity." See *id.* at 10-11.

"A statute must be interpreted in such a way as to effectuate the legislative intent underlying its enactment." *Entergy Nuclear Generation Co.* v. *Department of Envtl. Protection*, 459 Mass. 319, 329 (2011). In this context, an administrative agency's means of implementing the statutory goals will stand "so long as the regulation is rationally related to those goals." *Id.* at 331, quoting from *American Family Life Assurance Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 477, cert. denied, 464 U.S. 850 (1983). Given this express legislative mandate ensuring that all

public authorities, and privately financed buildings open to the public. See St. 1971, c. 584, § 1; St. 1971, c. 827, § 1. In 1974, the statute was amended to include public sidewalks, parking garages, condominium units, the public areas of apartment buildings, shopping centers, and restaurants. See St. 1974 c. 528, § 1. The board was initially known as "[a] [b]oard to adopt rules and regulations for the construction and maintenance of public buildings for the purpose of facilitating the use of such buildings by physically handicapped persons." In 1974, the name was changed to the "Architectural Barriers Board." It was retitled the "Architectural Access Board" in 1986.

[11]St. 1986, c. 642, § 2.

[12]521 Code Mass. Regs. §§ 1.00 et seq. (1986).

buildings are "100 [percent] accessible," the board's interpretation of its regulations is consistent with the remedial purposes of the law. We cannot say that the board acted in excess of its authority.[13]

Hollister also claims that the board's consideration of "experiential factors" is an invitation to "standardless" adjudication. In light of the articulated legislative purpose, the board did not err in considering the actual experience of customers of Hollister in wheelchairs, who testified that they felt excluded and were, in fact, excluded by the design. The board did not exceed its authority by considering this testimony in addition to the more finite measures of grade, level, and distance. The porch provided not only a more convenient central point of access to the store, but also amenities and decorative elements not associated with the handicapped accessible entrance.[14] When the unadorned accessible door failed — a not unforeseeable event — customers in wheelchairs were blocked from entry entirely. One witness testified that he had to be carried into a Hollister store at a different location. Far from being standardless, the requirement that "any access point" to a building or portion of a building be accessible is a concrete, bright line measure, which ensures accessibility. While the legislative mandate does not compel the board's conclusion here, it does not preclude it either. In light of this record and the legislative history, the board's decision was not arbitrary, capricious, or contrary to law.

3. *Variance.* Hollister requested, in the alternative, that the board grant a variance. In order to obtain the variance, Hollister must show either that compliance is not technologically feasible or that it would result in "excessive and unreasonable costs without any substantial benefit to physically handicapped persons." G. L. c. 22, § 13A. See 521 Code Mass. Regs. §§ 4.1, 5.1.[15] For the reasons stated above, the board's determination of

---

[13]Hollister maintains that G. L. c. 22, § 13A, is a building code statute, not civil rights legislation, and that once "persons with disabilities are provided with functional, safe access, the [b]oard's authority ends." However, as the preceding discussion makes clear, the statute is both.

[14]One board member described the handicapped accessible entrance as a second class entrance.

[15]Hollister does not challenge the board's decision on the grounds of technological feasibility.

substantial benefit is not contrary to law and is supported by the record. "A cost-benefit analysis is not relevant if . . . the board determines that there would be substantial benefit. Only if there is no substantial benefit does the issue of the cost of complying with the regulation become important." *Pyramid Co. of Hadley* v. *Architectural Barriers Bd.*, 403 Mass. at 131. Given the board's finding with respect to substantial benefit, the board was not obligated to consider cost, nor was it obligated to accept Hollister's estimate.

Even if cost were considered, the board did not find the construction estimates of between $64,000 and $100,000 to be adequately supported in the record. Although Hollister provided a cost estimate, the board considered the estimate excessive.[16] This determination was for the fact finder. See *id.* at 130-131. The statute specifically envisions that individuals with experience in construction and design will sit on the board. We give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." *Ten Local Citizen Group* v. *New England Wind, LLC*, 457 Mass. 222, 228 (2010), quoting from *Friends & Fishers of the Edgartown Great Pond, Inc.* v. *Department of Envtl. Protection*, 446 Mass. 830, 836 (2006).

The Superior Court judge's decision denying the motion for judgment on the pleadings and entering judgment on behalf of the board is affirmed.

*Judgment affirmed.*

BERRY, J. (dissenting). The defined term "entrance" in the Architectural Access Regulations, 521 Code Mass. Regs. § 5.1 (2006), cannot, in my opinion, be deconstructed in the manner that the Architectural Access Board (board) proposes in this case. That a single entrance into a building at one particular location on the building footprint has multiple doors framed into that single entrance does not transform that single entrance into multiple separate entrances, as the board has written.

---

[16]The board noted that there was no confirmation of the estimate. The board also questioned Hollister's assumption of lost revenues due to store closure, since one or two of the side doors could remain open during construction.

The board's deconstruction of, then reconstruction of, what constitutes an entrance to a building, which lifts and repositions various words and phrases — from within the very defined term at issue, "entrance" in § 5.1 — is not sustainable as a matter of administrative law, nor is the board's single and conclusory rewrite sentence, which contains no legal or reasoned analysis. The board gives us only the following, and sole, sentence in a "Conclusion" section:

> "The *doors* into the [J.M.] Hollister Co. [(Hollister)] Store at the Independence Mall *are separate entrances* since they are *separate access points* into the tenant space. Therefore, all are required to comply in full with 521 [Code Mass. Regs. §] 25.1." (Emphasis added.)

That this rewriting by the board of the term "entrance" is not supportable is starkly evident if one juxtaposes the board's single sentence deconstruction with the actual plain text of "entrance" as appearing in § 5.1, which is as follows:

> "Any access point to a *building* or portion of a *building* or *facility* used for the purpose of entering. An *entrance* includes the approach *walk*, stairs, lifts, ramp or other vertical access leading to the entrance platform; the entrance platform itself; vestibules, if provided; the entry door(s) or gate(s); and the hardware of the entry door(s) or gate(s)."

A comparison of the board's rewriting against the actual regulatory language demonstrates that, under the regulation, "door(s)" are not, contrary to what the board writes, "separate entrances," and are not, contrary to what the board writes, "separate access points." Rather, under the regulation, "door(s)" are what "[a]n entrance includes." Indeed, the term "entrance" in § 5.1 envisions that there may be multiple "door(s)" in a single "entrance."

Section 5.1, on its face, is predicated on an architectural and building construction mode that ensures that any entrance, which serves as an access point to a building at a particular place within the building footprint, must be fully handicapped accessible. Under this model, if there were several entrances into a building that served as access points at other various locations

within the building footprint, each such variously located entrance would be fully handicapped accessible. But these architectural construction principles are not the same as, and cannot be reworked by word-shifting to mean *that a single entrance at a single and particular location in a building footprint, which happens to be framed with multiple doors,* is somehow transformed into multiple and separate entrances at the one building location, with each door constituting a separate entrance.[1,2] This is precisely, and in error of law, what the board has done.

It is perfectly clear that "all public *entrances* of a *building* or tenancy in a *building* shall be *accessible.*" 521 Code Mass. Regs. § 25.1 (2006). It is further perfectly clear that, in enacting G. L. c. 22, § 13A, and establishing the Architectural Access Board, our government intended to protect and vindicate rights of access for persons with disabilities. This is a fundamental and important government mission. That mission, however, for which the majority gives very extensive background, does not resolve the outcome-determinative issue presented in this

---

[1]For example, under the Architectural Access Regulations, an "entrance" may have handicapped-inaccessible "revolving doors" and "turnstiles." In such a multiple-door entrance with a revolving door or turnstile, not all doors need be handicapped accessible, so long as the turning door or doors, which are not handicapped accessible, are flanked by at least one adjacent door with full handicapped access.

As to revolving doors, 521 Code Mass. Regs. § 26.2 (2006) states as follows:

> "Revolving doors shall not be the only means of passage at an *accessible entrance* or along an *accessible route* unless the revolving door is also *accessible.* An *accessible* door shall be provided adjacent to a revolving door and shall permit the same use pattern."

As to turnstiles, § 26.3 states as follows:

> "Turnstiles shall not be the only means of passage at an *accessible entrance* or along an *accessible route.* An *accessible* gate shall be provided adjacent to the turnstile and shall be designed to permit the same use pattern, complying with 521 [Code Mass. Regs. §§] 26.2.1 and 26.2.2."

[2]Although, as a historic building, the John Adams Courthouse is not subject to the Architectural Access Regulations, one can quickly see a single entrance with multiple doors within its grand framework at the Pemberton Square entrance. See also the Somerset Street entrance.

appeal concerning what constitutes an "entrance" under the black and white text of § 5.1.

The board's deconstruction, then, of the term "entrance" in a manner which makes each and every door, although framed within a single "entrance," into separate multiple "entrances" is, I submit, an error of law. See G. L. c. 30A, § 17. "Where an agency's determination involves a question of law . . . it is subject to de novo review." *Springfield* v. *Department of Telecommunications & Cable*, 457 Mass. 562, 568 (2010). Although we may afford deference to an agency's interpretation of its own regulations, "[n]o such deference is appropriate . . . when the commission [or board] commits an error of law." *Boston Police Superior Officers Fedn.* v. *Labor Relations Commn.*, 410 Mass. 890, 892 (1991). The standard of review involves appropriate deference to well-grounded agency analysis of regulations, but "this principle is deference, not abdication, and courts will not hesitate to overrule agency interpretations when those interpretations are arbitrary, unreasonable, *or inconsistent with the plain terms of the regulation itself*" (emphasis supplied). *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991). In this matter, the board's error of law, if left undisturbed, has ramifications that will affect the future construction of, the architectural renderings of, and the construction cost of buildings all over the Commonwealth — including buildings of greater stature and monument than this commercial entrance to a commercial store in a shopping mall.[3]

There is little reason for this court to afford deference to the board's reading of the term "entrance" in this case, because its decision lacks any reasoned analysis and is "inconsistent with the plain terms of the regulation itself." *Ibid.* There are several flaws that demonstrate the error of law in the board's rewriting of what an entrance is, and which undercut administrative defer-

---

[3]While the Hollister storefront is not, to use understatement, an architectural wonder, the revised definition of "entrance" adopted by the board here will have fundamental planning and development impact on future building designs. Given that there will be far more reaching architectural ramifications beyond this store's porch and doors, I need not add to, or offer commentary on, the prose description of the store's entrance, which is detailed in the majority opinion.

ence in this appellate review. See *Boston Police Superior Officers Fedn.* v. *Labor Relations Commn., supra.*

First, as noted above, the board in its single sentence fiat has not set forth any reasoned analysis that supports its rewriting of the defined term "entrance." In fact, the rewriting clashes with the black and white text of § 5.1.[4]

Second, the lack of reasoned analysis is evident when one considers the full procedural history of this case. The decision of the board is a second attempt by the board to address what the term "entrance" encompasses. The first board decision, dated November 18, 2008, was sent back to the board on remand by a Superior Court judge following a first G. L. c. 30A review (Superior Court docket no. SUCV2008-05540) (hereinafter *Hollister I*). As stated in the second board decision, on remand the board was directed to address three omissions in its first decision including: "1) the jurisdiction of the [b]oard, 2) *whether or not the doors at the front of the Hollister* [*sic*] *consist of one or more entrance(s)*, and 3) if it is determined that more than one entrance is provided, if a variance to 521 [Code Mass. Regs. §] 25.1 should be granted" (emphasis added).

In remanding on the second question concerning what constitutes an "entrance," and whether multiple doors framed in one entrance make for multiple "entrances," the Superior Court judge found that the administrative record in *Hollister I* on this precise issue was "thin" and that the board did not "elucidate this issue."[5] Following the remand and further hearings, the board issued a second decision dated May 26, 2010. This second

---

[4] I do not understand what the majority means in note 3, *ante*. The board's redefining of the term "entrance" will, of course, affect not only the *use* of buildings, but also the future design and construction of them. Further, the redefinition of the term "entrance" is not, as the majority suggests in note 7, *ante*, just about the *use* of an entrance; instead, it is a broad-reaching reinvention of what an "entrance" is.

[5] In the remand on the second question, the judge wrote as follows:

"While the court finds that the administrative record on this point is *thin* with respect to facts that might elucidate this issue, the court does not reach the question of whether Hollister's store design has one entrance or two. On remand the [b]oard may wish to permit additional evidence to be presented on whether such side by side doors are common and what reasonably constitutes one entrance, but that is for the [b]oard to decide."

board decision was affirmed by a different judge in a new and separately docketed Superior Court proceeding for review under G. L. c. 30A (Superior Court docket no. SUCV2010-02567).[6] Notwithstanding this affirmance, this second board decision does not make the record less "thin," nor does this second decision provide any "elucidat[ion]" of the board's revamping of the defined term "entrance."

Third, the error of law in the board's positing of a new and novel theory of what an entrance is mixes and merges and repositions unified words to create a meaning different from that which is already embedded within the defined term "entrance" in § 5.1. The path to this rewriting is difficult to fathom. The "multiple door" theory *does not* appear in the first board decision. The theory emerges only in the second board decision. And, as noted before, the theory and the rewriting of § 5.1 appears in a single sentence almost as afterthought, without analysis of the plain text of the regulation. In effect, the board's rewriting gives rise to a redundancy which runs like this: if an entrance to a building at one particular location has one door in its framework, that one door equals one entrance; but, if an entrance to a building at the same particular location is framed with multiple doors, then the "multiple door" theory transforms the one entrance with multiple doors per se into multiple "separate entrances." So it is that the board has created a new redundant definition in which the word "entrance(s)" virtually morphs into the word "door(s)."

The board's rewriting of the regulation defining "entrance" in § 5.1 is an error of law, and accordingly, for the reasons stated herein, I dissent.

---

[6]The second Superior Court memorandum and decision quotes the board's ruling "that each door to the store was a separate entrance," and then briefly states, "this [b]oard determination was based on substantial evidence *and was supported by the regulations*" (emphasis supplied). However, what the defined term "entrance" means in respect to multiple doors — which is the pivotal issue in this appeal — is not discussed further in the memorandum other than the highlighted reference.